AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 20-ml-1330 |
| Information associated with https://www.facebook.com/ khairy.jay.90, https://www.facebook.com/khairi.saadallah.9, and https://www.facebook.com/khairy.adamthug stored at premises controlled by Facebook, Inc. | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, hereby incorporated by reference

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attached Affidavit in Support of Search Warrant | |

The application is based on these facts:

See Attached Affidavit in Support of Search Warrant

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Todd C. Bina*
*Applicant's signature*

Todd C. Bina, Supervisory Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: _____10/27/2020_____

_____
*Judge's signature*

City and state: Washington, D.C.

Robert B. Collings, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  20-ml-1330 |
| Information associated with https://www.facebook.com/ | ) | |
| khairy.jay.90, https://www.facebook.com/khairi.saadallah.9, | ) | |
| and https://www.facebook.com/khairy.adamthug stored at | ) | |
| premises controlled by Facebook, Inc. | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

**YOU ARE COMMANDED** to execute this warrant on or before _____November 10, 2020_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _Robert B. Collings, United States Magistrate Judge_ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _10/27/2020 11:00 am_ 

_____
*Judge's signature*

City and state:  _Washington, D.C._ 

_Robert B. Collings, United States Magistrate Judge_
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-ml-1330 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

Todd C. Bina, Supervisory Special Agent, FBI
_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information that is associated with the Facebook accounts identified by https://www.facebook.com/khairy.jay.90 (associated with the ID number 100052074163700); https://www.facebook.com/khairi.saadallah.9 (associated with the ID number 100022171453167); and https://www.facebook.com/khairy.adamthug (associated with the ID number 100005921824671) and is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

I.     **Information to be disclosed by Facebook Inc. ("PROVIDER") to facilitate
       execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, regardless of whether such information is located within or

outside of the United States, including any messages, records, files, logs, or other information

that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a

request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following

information to the government for each account or identifier listed in Attachment A (the

"Account"):

a.     For the time period of June 4, 2020 to and including June 21, 2020 for the account

https://www.facebook.com/khairy.jay.90 and for the time periods of October 7, 2017

to and including October 13, 2017 and July 11, 2018 to and including July 13, 2018

for the account https://www.facebook.com/khairi.saadallah.9:  The contents of any

available messages or other communication associated with the Account (including,

but not limited to, messages, attachments, draft messages, posts, chats, video calling

history, "friend" requests, discussions, recordings, images, or communications of any

kind sent to and from the Account, including stored or preserved copies thereof), and

related transactional records for all PROVIDER services used by an Account

subscriber/user, including the source and destination addresses and all Internet

Protocol ("IP") addresses associated with each message or other communication, the

date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.  For the time period of June 4, 2020 to and including June 21, 2020 for the account https://www.facebook.com/khairy.jay.90 and for the time periods of October 7, 2017 to and including October 13, 2017 and July 11, 2018 to and including July 13, 2018 for the account https://www.facebook.com/khairi.saadallah.9:  All photos, including all profile picture(s), and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.  For the account https://www.facebook.com/khairy.adamthug (associated with the ID number 100005921824671):  The current profile picture and any other metadata associated with the current profile picture, including the date and time the profile picture was uploaded;

d.  For the time period of June 4, 2020 to and including June 21, 2020 for the account https://www.facebook.com/khairy.jay.90 and for the time periods of October 7, 2017 to and including October 13, 2017 and July 11, 2018 to and including July 13, 2018 for the account https://www.facebook.com/khairi.saadallah.9:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-

2

Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; and information about the Account's access and use of Facebook applications;

e.  For the time period of June 4, 2020 to and including June 21, 2020 for the account https://www.facebook.com/khairy.jay.90:  All information held by PROVIDER related to the location data and location history of the user(s) of the Account (including those collected for non-PROVIDER based applications) whether derived from Global Positioning System ("GPS") data, cell site/cell tower triangulation/trilateration, precision measurement information such as timing advance or per call measurement data, Wi-Fi locations, IP addresses, search history, advertising data, or metadata of images and videos, "check ins" and other location information**;**

f.  For the time period of June 4, 2020 to and including June 21, 2020 for the account https://www.facebook.com/khairy.jay.90 and for the time periods of October 7, 2017 to and including October 13, 2017 and July 11, 2018 to and including July 13, 2018 for the account https://www.facebook.com/khairi.saadallah.9:  All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

g.  Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the

3

Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account);

h. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s); and

i. Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the service of this warrant, PROVIDER shall deliver the information set forth above via United States mail or courier to: Special Supervisory Agent Robert Basáñez

4

Federal Bureau of Investigation, J. Edgar Hoover Building, MLAT Unit, Room 7848, 935

Pennsylvania Ave., NW, Washington, D.C. 20535-0001, or via e-mail to

HQ_ISP_MLAT_Returns@FBI.gov.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of criminal laws of the United Kingdom, specifically Section 1(1) of the Criminal Attempts Act 1981 and the common law and of the United Kingdom regarding attempted murder and murder, including, for each Account information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)  Information that constitutes evidence concerning Khairi Saadallah's involvement, connection, or communication with any terrorist, military, militia, or other violent

6

or armed group, including Ansar al Sharia and/or the February 17th Martyrs Brigade;

(f) Information that constitutes evidence concerning Khairi Saadallah's mental health;

(g) Information that constitutes evidence concerning Khairi Saadallah's motivations behind the June 20, 2020 attack, including that the attack was designed to influence the government or an international governmental organization and/or to intimidate the public or a section of the public and/or committed for the purpose of advancing a political, religious, racial or ideological cause;

(h) Information that constitutes evidence concerning Khairi Saadallah's preparations for the June 20, 2020 attack and any plans or preparations for any other attack;

(i) Information that constitutes evidence concerning the movements and actions of Khairi Saadallah leading up to, during, and after the June 20, 2020 attack;

(j) Information that constitutes evidence of communications to, with, and between Khairi Saadallah and any other witness in the attempted murder and murder investigation; and

(k) Information that constitutes evidence concerning any concealment or efforts to conceal information relevant to the attempted murder and murder investigation.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States and shared with appropriate foreign authorities.

Law enforcement personnel will then seal any information from PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THREE ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. PURSUANT TO 18 U.S.C. 2703 AND 3512** | **20-ml-1330**<br><br>**Filed Under Seal** |

*Reference:      DOJ Ref. # CRM-182-75203; Subject Accounts: https://www.facebook.com/khairy.jay.90 (associated with the ID number 100052074163700); https://www.facebook.com/khairi.saadallah.9 (associated with the ID number 100022171453167); and https://www.facebook.com/khairy.adamthug (associated with the ID number 100005921824671).*

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Todd C. Bina, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information which is associated with three accounts – that is, https://www.facebook.com/khairy.jay.90 (associated with the ID number 100052074163700), https://www.facebook.com/khairi.saadallah.9 (associated with the ID number 100022171453167), and https://www.facebook.com/khairy.adamthug (associated with the ID number 100005921824671) – which is stored at premises controlled by Facebook, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which accepts service at 1601 Willow Road, Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require PROVIDER to disclose to the government

copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      The information requested in this search warrant is being sought pursuant to a request for assistance ("Request") from the Home Office in the United Kingdom, transmitted to Washington, D.C.  Authorities in the United Kingdom are prosecuting Khairi Saadallah ("Saadallah") for attempted murder and murder, which occurred on June 20, 2020, in violation of Section 1(1) of the Criminal Attempts Act 1981 and the common law of the United Kingdom.  A copy of the applicable laws is appended to this application.  This Request is made pursuant to the Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters signed 6 January 1994, U.K.-U.S., Dec. 16, 2004, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Instrument").  Under the Instrument, the United States is obligated to render assistance in response to this Request.

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2005.  I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit, in Washington, D.C.  My current duties include responding to requests from foreign governments pursuant to mutual legal assistance treaties, including serving as the affiant on search warrant affidavits, serving search warrants, and reviewing the data received in response thereto for relevance in compliance with the parameters of the search warrants.  During

my employment with the FBI, I have conducted investigations related to numerous criminal and counterterrorism violations. I have written and executed search warrants and analyzed the collected evidence. I have also received training in the collection, handling, and analyzing of search warrant evidence.

4.     The facts set forth in this affidavit are based upon information conveyed to the United States via the Request made pursuant to the Instrument by authorities in the United Kingdom and upon my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the criminal laws of the United Kingdom have been committed by Saadallah. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.     Pursuant to the applicable treaty, this Court has jurisdiction to issue the proposed Order. *See* Instrument Annex art. 5(1) (authorizing courts to issue orders necessary to execute the request). In addition, this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court "is acting on a request for foreign assistance pursuant to [18 U.S.C.] section 3512 . . . ." 18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703"), § 3512(c)(3)

("application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia").

7.     This application to execute the United Kingdom's request has been approved and duly authorized by an appropriate official of the Department of Justice, through the Criminal Division, Office of International Affairs ("OIA").[1]  *See* 18 U.S.C. § 3512(a).  An OIA attorney has authorized the undersigned to file this application.

## PROBABLE CAUSE

8.     UK authorities are prosecuting Saadallah for three counts of murder and three counts of attempted murder.  Specifically, on June 20, 2020, Saadallah attacked at least two groups of individuals without provocation in a park in Reading, the United Kingdom (the "attack").  In the span of approximately a minute, Saadallah stabbed several individuals with a knife.  Three of the victims died as a result of their injuries.

**The Attack**

9.     Based on analysis of CCTV footage and statements provided by witnesses to and victims of the attack, UK authorities have established the following timeline of events leading up to the attack on June 20, 2020:

- On June 19, 2020, Saadallah purchased a knife and a pair of gloves.

- Shortly after 6:00 P.M. local time on June 20, 2020, Saadallah left his home and walked toward Forbury Gardens, a public park in Reading, the United Kingdom.  As he

---

[1]  The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters.  *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81B and 81C (2018).

approached the park, CCTV footage shows Saadallah purposefully damaging his mobile phone and discarding it along with the backpack he was carrying.

- Based on witness statements, after Saadallah entered the park he ran suddenly toward a group of seven males sitting in the grass. Without provocation and in rapid succession, Saadallah stabbed two of the males in the neck and the third in the back with a knife, ultimately causing the death of all three men. A fourth man also sustained serious injuries to his head. As other members of the group fled, Saadallah chased them. As he chased them, witnesses said that Saadallah said "Allahu Akbar," which translates from Arabic as "God is Greatest."

- Based on witness statements, Saadallah then attacked a second group of five people, stabbing two men in the group, causing serious injuries to both. Saadallah then discarded his knife and ran out of the park. Based on CCTV footage showing Saadallah entering and leaving the park, the entire attack lasted approximately less than a minute.

- After leaving the park, CCTV footage shows Saadallah returning to his backpack, deliberately cutting his right hand, and then walking briskly away from the park. A witness stated that as Saadallah walked past a bus driver, he shouted "Allahu Akbar" and "Victory on Infidels."

10.    Saadallah was arrested shortly after the attack. During the arrest, Saadallah was heard asking God in Arabic whether he was pleased with his jihad. While in police custody, Saadallah also made the following statements:

- "I want to plead guilty for the jihad that I done and go to court tomorrow."

- "That shit that caused the reaction from yesterday, they started it."

- "Tell them I want to plead guilty to the jihad that I done and go to court tomorrow."

- "Those men I killed were wronguns, they deserved it."

- "They harassed me on Facebook, they got what was coming to them."

- "I'm going to paradise for the jihad what I did to them."

- "What happened yesterday, bombing Italy, Germany all of you will see I'm going to leave my name, I'm not afraid and I'm going to die, we are all going to go at the end of the war."

11.     Subsequently during interviews with police between June 22, 2020 and June 26, 2020, Saadallah admitted to stabbing the victims, but said that he was not in control of himself at the time and further denied that the attack was for terrorist purposes.  Rather, he claimed that he was controlled by "the magic," stating, "I didn't want to kill them it was the magic."  He also told the police that his sister told him "they" had been harassing her on Facebook and so he needed to use "the magic" to kill them.  Prior to the attack, Saadallah was being seen for mental health issues.

**Saadallah's Background**

12.     Saadallah immigrated to the United Kingdom from Libya in 2012.  Prior to his immigration to the United Kingdom, based on records from the UK's Home Office Immigration Department as well as Saadallah's admissions to police, Saadallah fought with Ansar al Sharia, a terrorist organization as designated by the United Kingdom, during the Arab Spring uprising in 2011 and 2012 in Libya.  In addition, the Home Office Immigration Department records and a copy of Saadallah's "membership" identification card posted by Saadallah's brother on Facebook, also show that Saadallah was a member of the February 17th Martyrs Brigade, an Islamist based militia in Libya.  After his immigration to the United Kingdom, Saadallah was convicted and imprisoned at various times for criminal offenses between June 2014 and August

2019, including for possession of bladed articles.  He was last released from incarceration on June 5, 2020.

**Saadallah's Use of Facebook**

13.     UK authorities recovered the mobile phone Saadallah attempted to discard just before entering the park on June 20, 2020.  In addition, UK authorities identified a witness ("Witness 1") who communicated extensively with Saadallah on Facebook since, at least, April 2012.  Witness 1 allowed UK authorities to make copies of her communications with Saadallah on Facebook.

14.     Based on an analysis of the recovered mobile phone as well as the Facebook communications provided by Witness 1, UK authorities identified the following four Facebook accounts used by Saadallah:

- https://www.facebook.com/khairy.jay.90 (associated with the ID number 100052074163700 and the vanity name "Khairi Jay");

- https://www.facebook.com/khairi.saadallah.9 (associated with the ID number 100022171453167 and the vanity name "Khairi Aymen");

- https://www.facebook.com/khairy.adamthug (associated with the ID number 100005921824671, the e-mail address khairyadamthug@yahoo.com, and the vanity name "Khairy Edgam Thug Thug"); and

- https://www.facebook.com/Guenstboy (associated with the ID number 10001344024951, the e-mail address kjs2pac@yahoo.com, and the vanity name "Khairy Thug").

15.     Witness 1 communicated with Saadallah on the "Khairi Jay" account beginning on June 6, 2020 until the day of the attack.  For instance, on June 6, 2020, Saadallah asks Witness 1 if she wants to play the "magic game" and further tells her not to "be afraid."  Witness

1 declines his offer.  On June 21, 2020, approximately five hours after the attack, Witness 1 sent Saadallah the following message:  "Oh khairy please done' tell me you've done anything stupid. Get in touch please Xx."

16.     Other than Saadallah's communications with Witness 1, Saadallah appears to have been actively using the "Khairi Jay" account up until the day of the attack.  For instance, the data recovered from Saadallah's mobile device shows that he used this account to send a message on June 19, 2020, but then the message was deleted.  In addition, from approximately June 13 to June 19, 2020, Saadallah also uses this account to research Facebook Groups about buying a "cheap car," which UK authorities suspect may have been research into a possible "lone wolf" attack using a car.

17.     Witness 1 also communicated with Saadallah on the "Khairi Aymen" account from, at least, September 2017 until May 21, 2020.  Based on data recovered from Saadallah's mobile device, Saadallah also used the "Khairi Aymen" account on October 8, 2017 to post the following message, " . . . every weekend I'm locked up if not fight against the cop's fuck the public up with my evil level don't blaum [sic] me when i was 16 am solider in the rebels . . .". On October 12, 2017, Saadallah also posted an image of road sign on a building reading "ISIS Court."  In addition, again based on data recovered from Saadallah's mobile device, Saadallah used this account again on July 12, 2018 stating, "and u know what else am not coming again going bk [sic] to army," after posting a message that says he will return to Libya.

18.     Witness 1 communicated with Saadallah on the "Khairy Edgam Thug Thug" account from May 2013 until July 2013.  Based on open source research, the "Khairy Edgam Thug Thug" account's current profile picture is an image of Saadallah wearing a scarf to mask

some of his face and holding two assault rifles.  The date that this particular image was posted is unknown.

19.     Witness 1 communicated with Saadallah on the "Khairy Thug" account from April 2012 until May 2018.

20.     UK authorities have also determined that Saadallah holds the Facebook account https://www.facebook.com/khairi.saadallah (associated with the ID number 100007646260900, the vanity name "Khairi Saadallah," and registered with the e-mail address khairyjs@yahoo.com).  The "Khairi Saadallah" account was created on January 31, 2014 and was still enabled as of June 2020.  After the attack on June 20, 2020, several members of the public posted comments directed at Saadallah on this account in reaction to the attack.

21.     Based on the analysis of Saadallah's mobile phone, UK authorities recovered cached images on the device that had been downloaded from Facebook.  Some of these recovered images depicted soldiers of the February 17th Martyrs Brigade.  However, these cached images could not be attributed to a certain date or to a certain Facebook account.

**The Prosecution**

22.     The Facebook accounts outlined above are hosted by PROVIDER.

23.     UK authorities anticipate that two issues will be particularly relevant during the prosecution of Saadallah:  the extent of and impact of Saadallah's mental health issues and whether the murders were committed for a terrorist purpose.  Under Section 30 of the Counter Terrorism Act 2008, a UK court must consider whether the offense has a "terrorist connection" for the purposes of sentencing a defendant.  Under Section I of the Counter Terrorism Act 2008, in order to prove that an act was committed for a terrorist purpose, the prosecution must present evidence that shows the defendant's actions were: "(i)  designed to influence the government or

an international governmental organization or to intimidate the public or a section of the public and (ii) committed for the purpose of advancing a political, religious, racial or ideological cause."

24.      As a result, UK authorities seek content records from PROVIDER for the Facebook accounts https://www.facebook.com/khairy.jay.90 (associated with the ID number 100052074163700 and the vanity name "Khairi Jay") and https://www.facebook.com/khairi.saadallah.9 (associated with the ID number 100022171453167 and the vanity name "Khairi Aymen") in an effort to further determine the nature and scope of Saadallah's criminal activities, including the extent of his mental health issues and possible terrorist motivations.  In addition, UK authorities seek the profile picture and associated metadata for the profile picture for the Facebook account https://www.facebook.com/khairy.adamthug (associated with the ID number 100005921824671 and the vanity name "Khairy Edgam Thug Thug").

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

25.      PROVIDER is the provider of the internet-based accounts identified by https://www.facebook.com/khairy.jay.90 (associated with the ID number 100052074163700), https://www.facebook.com/khairi.saadallah.9 (associated with the ID number 100022171453167), and https://www.facebook.com/khairy.adamthug (associated with the ID number 100005921824671).

26.      PROVIDER owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook").  The website is owned and operated by PROVIDER.  PROVIDER allows Facebook users to establish accounts with PROVIDER, and users can then use their Facebook accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the general public.

27.     PROVIDER asks users to provide basic contact and personal identifying information to PROVIDER, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  PROVIDER also assigns a user-identification number ("user ID") to each account.  PROVIDER identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

28.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  PROVIDER assigns a group identification number to each Facebook group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

29.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these

privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

30.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

31.     PROVIDER allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video.  For PROVIDER's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

32.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by PROVIDER unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such

comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

33.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a PROVIDER account can be indefinitely stored in connection with that account, unless the subscriber deletes the material.  Further, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.

34.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked".  Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user-generated messages or other content.

35.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

37.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39.    In addition to the applications described above, PROVIDER also provides Facebook users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

40.    PROVIDER also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

41.    Depending on the user's privacy settings, PROVIDER may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

42.    Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases,

Facebook users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

44.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its

products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

45.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

46.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the

communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

47.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

48.     As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by PROVIDER, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and

when the account was accessed or used.  For example, as described above, PROVIDER logs the

IP addresses from which Facebook users access their accounts along with the time and date.  By

determining the physical location associated with the logged IP addresses, investigators can

understand the chronological and geographic context of the account access and use relating to the

crime under investigation.  Such information allows investigators to understand the geographic

and chronological context of Facebook access, use, and events relating to the crime under

investigation.  Additionally, PROVIDER builds geo-location into some of its Facebook

services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook

"friends" to locate each other.  This geographic and timeline information may tend to either

inculpate or exculpate the Facebook account user.  Last, Facebook account activity may provide

relevant insight into the Facebook account user's state of mind as it relates to the offense under

investigation.  For example, information on the Facebook account may indicate the owner's

motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or

consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from

law enforcement).[2]

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

49.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of

Criminal Procedure, permission to communicate information to the Court by telephone in

connection with this Application for a Search Warrant.  I submit that OIA Trial Attorney

---

[2] At times, social media providers such as PROVIDER can and do change the details and functionality of
the services they offer.  While the information in this section is true and accurate to the best of my
knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in
connection with submitting this application for a search warrant.  Instead, I rely upon my training and
experience, and the training and experience of others, to set forth the foregoing description for the Court.

Martyna Pospieszalska, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

50.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Todd C. Bina
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on October 27, 2020.

Robert B. Collings
UNITED STATES MAGISTRATE JUDGE

19

## Relevant Provisions of the United Kingdom's Common Law

### Section 1 of the Criminal Attempts Act 1981 – Attempting to Commit an Offense

    (1) If, with intent to commit an offense to which this section applies, a person does an act which is more than merely preparatory to the commission of the offense, he is guilty of attempting to commit the offense.

### Murder

Murder is a common law offense in the United Kingdom.  The crime of murder is committed where a person of sound mind and discretion unlawfully kills any reasonable creature in being under the Queen's peace with intent to kill or cause grievous bodily harm.  In all cases of murder, the sentence is mandatory.  Offenders aged twenty-one or over must be sentenced to imprisonment for life.